IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                3:11-CR-00026-BR

       Plaintiff,

                                             OPINION AND ORDER

v.

TOMMY LEE VASQUEZ,

       Defendant.


**S. AMANDA MARSHALL**
United States Attorney
**RYAN W. BOUNDS**
**JOHNATHAN S. HAUB**
Assistant United States Attorneys
1000 S.W. Third Ave., Ste. 600
Portland, OR 97204
(503) 727-1000

       Attorneys for Plaintiff

**STEVEN T. WAX**
Federal Public Defender
**C. RENEE MANES**
Assistant Federal Defender
101 S.W. Main Street
Suite 1700
Portland, OR  97201
(503) 326-2123

       Attorneys for Defendant

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on the issue of restitution.

## BACKGROUND

The Court takes the following facts from its June 6, 2012, Opinion and Order (#133):

On November 21, 2010, approximately three weeks after Defendant Tommy Vasquez began to serve a lengthy prison sentence at the Federal Correctional Institution (FCI) in Sheridan, Oregon, he became involved in an escalating verbal exchange initiated by another inmate, Theodore Vickers.  The verbal exchange was observed by several other inmates in the same housing unit.  At the beginning of the exchange Vickers was on the upper tier and Vasquez was seated on the lower level at a table playing cards with inmate Adolph Spears.  Although both Vickers and Vasquez mutually exchanged insults, Vickers also threatened physical harm to Vasquez.  After the verbal exchange, another inmate told Vasquez that he needed to "take care of business"; that is, to address the fact that Vickers insulted and threatened him in front of other inmates.  Someone also told Vickers that Vasquez was waiting for him in the "Paisa" (Hispanic) television viewing room.  By the time Vickers approached the television room, chairs had been moved out of the

2 - OPINION AND ORDER

way as if to prepare it for a fight. When Vickers came to the door, Vasquez (who was inside the room alone) either lunged at Vickers or swung something at him that caused Vickers to step back from the doorway. Vasquez then pulled Vickers's leg, and the two began to fight moving from outside of the television room to the inside. As the two continued to fight alone in the television room, inmates observing nearby closed the door to the room. The two continued to fight until Vasquez, who was on one knee, used a "wrestling maneuver" to lift Vickers over Vasquez's shoulder and to throw Vickers forcefully head-first against the concrete floor causing Vickers "serious bodily injury" to his head. Vickers did not continue to fight. Vasquez left the television room.

After the physical altercation ended, Vickers was taken to the FCI Sheridan medical office and then transported to a local hospital and finally to Legacy Emmanuel Hospital in Portland where he underwent emergency surgery. Vasquez was taken to the Secure Housing Unit (SHU). The Bureau of Prisons (BOP) sustained $42,453.64 in medical bills for Vickers's treatment.

On March 5, 2012, a jury convicted Vasquez of one count of Assault Resulting in Serious Bodily Injury in violation of 18 U.S.C. § 113(a)(6) in connection with the physical altercation with Vickers.

On May 24, 2012, the United States Probation Office

3 - OPINION AND ORDER

recommended in their Presentence Report that the Court order restitution to the BOP in the amount of $42,453.64[1] for funds the BOP expended for Vickers's treatment.

On June 1, 2012, the Court sentenced Vasquez to 60 months imprisonment to be served consecutively with the sentence he is currently serving as well as three years of supervised release. The Court took the issue of restitution under advisement.

## DISCUSSION

Vasquez asserts the Court should deem the BOP to be a "participant" in the crime because "the BOP had the legal statutory duty to prevent inmate fights, and failed in that obligation."  Def.'s Sentencing Memo. at 23.  Thus, Vasquez contends the Court should decline to direct him to pay restitution to the BOP.  Vasquez relies on *United States v. Lazarenko* to support his position.

In *Lazarenko* the defendant was convicted of Money Laundering in violation of 18 U.S.C. § 1956(a) and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).  624 F.3d 1247, 1248 (9th Cir. 2010).  Peter Kiritchenko sought restitution under the Mandatory Victims Restitution Act of 1996

---

[1] It is undisputed that the Court lacks authority to award restitution for noneconomic damages such as pain and suffering or emotional distress, and the government does not seek any such damages as restitution.

4 - OPINION AND ORDER

(MVRA), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. § 3663. The defendant opposed restitution to Kiritchenko on the ground that he was a co-conspirator and, therefore, not a victim under either statute. *Id*. at 1249. The district court concluded Kiritchenko was a victim and, therefore, was entitled to restitution. The Ninth Circuit reversed on appeal. *Id*. at 1252. The Ninth Circuit explained:

> Kiritchenko's relationship to Lazarenko's criminal activity is somewhat complex. According to the government, Lazarenko used his political power to crush Kiritchenko's business competition. In exchange, Kiritchenko paid Lazarenko kickbacks from his enormous profits. Both profited handsomely from the arrangement. The government's indictment charged Lazarenko with conspiring to launder money with Kiritchenko, and the jury found the existence of that conspiracy. As part of the proof of money laundering, however, the government was required to prove that Lazarenko obtained the money through some specified unlawful conduct. The government alleged, and the jury found, that Lazarenko obtained the money illegally by means of extortion: Lazarenko extorted money from Kiritchenko. In sum, in the money-laundering scheme, Kiritchenko was both a victim and a participant.

*Id*. at 1250. The Ninth Circuit noted "[t]his situation is exceedingly rare . . . [and] the restitution statutes do not speak to this issue." *Id*. The court found under the "plain text" of the MVRA, "co-conspirators have just as much right to restitution as do innocent victims." *Id*. Nevertheless, the court found "a literal application of the plain text leads to

5 - OPINION AND ORDER

absurd results," and, therefore, "the plain text does not control."  *Id.* at 1251.  The court concluded "in the absence of exceptional circumstances, a co-conspirator cannot recover restitution for crimes in which he or she participates."  *Id*.  The court found Kiritchenko had not established exceptional circumstances justifying restitution because Kiritchenko "profited greatly from the overall criminal enterprise," the government "named [him] as the primary co-conspirator in the indictment," and he had a "deep and willing complicity in the heart of the conspiracy following his initial victimization."  *Id*. at 1252.

When determining whether Kiritchenko had established exceptional circumstances to justify restitution in *Lazarenko*, the Ninth Circuit distinguished the facts in that case from those in *United States v. Sanga*.  In *Sanga* the defendant was convicted of Conspiracy to Smuggle Aliens in violation of 8 U.S.C. § 1324(a)(1)(D) and Unlawful Procurement of Citizenship in violation of 8 U.S.C. § 1425.  967 F.2d 1332, 1333 (9th Cir. 1992).  The district court ordered restitution to Anne Marie Quinlob, who was one of the "aliens" smuggled into Guam by the defendant.  The defendant appealed on the ground that Quinlob could not be a victim for purposes of restitution because she was a willing participant in the conspiracy to smuggle herself into Guam from the Philippines.  *Id.* at 1333-34.

6 - OPINION AND ORDER

The Ninth Circuit concluded the defendant's position "lack[ed] merit."  *Id*. at 1334.  The Ninth Circuit noted when Quinlob arrived in Guam, the defendant instructed her that she would be his live-in maid.  *Id*.  When Quinlob said she preferred to return to the Philippines instead of acting as the defendant's maid, the defendant took away her passport and airline ticket and threatened to kill her.  *Id.* at 1334-35.  After Quinlob had worked for the defendant "approximately fourteen hours a day, seven days a week," the defendant "forced [Quinlob] to have sex with him" in return for providing Quinlob with a false Guam identification card that would allow her to obtain employment outside of the defendant's home.  *Id*. at 1335.  The court agreed Quinlob was a limited co-conspirator in that she agreed to facilitate her own smuggling into Guam.  Nevertheless, the court also concluded Quinlob was not barred from recovering restitution because "[a]ny criminal complicity in the conspiracy which Quinlob might bear stopped at the point at which she became the object of, rather than a participant in[,] the criminal goals of the conspirators," and she "did not willingly participate in the criminal behavior by which she was victimized."  *Id*. at 1335.

In *United States v. Lazar* the district court addressed whether, under *Lazarenko* and *Sanga*, the co-conspirators in *Lazar* could be victims pursuant to the MVRA.  770 F. Supp. 2d 447 (D. Mass. 2011).  In *Lazar* the alleged victims, B.L. and R.L., owned

7 - OPINION AND ORDER

a home at 3 Juniper Street in Wareham, Massachusetts. *Id.* at 448. B.L. and R.L. attempted to refinance their home, but they were turned down due to bad credit. Eventually B.L. and R.L. reached an agreement with the defendant that he would purchase 3 Juniper Street from B.L. and R.L., but he would permit them to remain in the home as tenants for one year and then would sell the home back to them. *Id.* at 449. B.L. and R.L. admitted they knew the defendant was going to represent falsely to the lender that he intended to occupy 3 Juniper Street as his primary residence and that the defendant "was going to get some money out of the equity of the house." *Id.* At closing B.L., R.L., and the defendant executed an Option Agreement that falsely stated B.L. and R.L. would pay a nonrefundable fee of $38,440.91 for an option to repurchase 3 Juniper Street when the tenancy expired. They also signed a HUD-1 Settlement Statement that falsely reflected B.L. and R.L. had received $45,118.62 in cash proceeds from the sale. The Purchase and Sale Agreement, the Option Agreement, and the HUD-1 were submitted as a package to the lender, and the lender gave the defendant two mortgages on 3 Juniper Street in the amount of $38,371.32. During the next year the defendant spent $3,577 to raise R.L.'s credit score by over 100 points so that she could qualify for a new mortgage when it came time to repurchase 3 Juniper Street. With the defendant's help, R.L. secured two mortgages totaling $269,000,

which was $75,000 greater than the balance of the original mortgage.  At the second closing R.L. and B.L. received $14,599.64 in cash and the deed to 3 Juniper Street.  *Id*.  Ultimately the defendant pled guilty to two counts of Wire Fraud in violation of 18 U.S.C. § 1343 based on the transactions involving B.L. and R.L.  *Id*. at 448.  The district court concluded, however, that B.L. and R.L. could not be considered victims for restitution under the MVRA.  *Id*. at 452.  The court noted the culpability of B.L. and R.L.

> would seem to lie in the middle of the spectrum that separates the victim in *Sanga* from the blatantly criminal coconspirator in *Lazarenko*.
>
> * * *
>
> B.L. and R.L. were not the instigators, or the main executors of the scheme, but their intent was *in pari materia* with that of [the defendant]. Under the law of conspiracy, they are not exonerated by their claim of imperfect knowledge of all of the details and workings of the scheme. *See United States v. Brandon*, 17 F.3d 409, 428 (1st Cir. 1994)("The government . . . need not prove that each defendant knew all of the details and members, or participated in all of the objectives, of the conspiracy as long as it can show knowledge of the basic agreement."). While the court is not without sympathy, given the sad series of events that plunged B.L. and R.L. into dire economic distress, and while the court understands the impulse that led them to a desperate effort to rescue the only home they had ever owned from foreclosure, thousands of other homeowners have faced similar hardships without resorting to mortgage fraud.
>
> * * *
>
> For evident reasons of public policy, a federal court cannot be seen as engaging in the shifting

9 - OPINION AND ORDER

>of criminal proceeds among or between coconspirators.

*Id*. at 451-52.

Taking *Lazarenko, Sanga,* and *Lazar* together, the Court concludes this is not the kind of exceedingly rare case in which a victim is also a co-conspirator. Even if the Court assumed for purposes of restitution only that the BOP's actions may have, in some way, contributed to Vicker's injuries,[2] it is clear that the BOP's intent was not *in pari materia* or on the same subject as Vasquez's intent. The Court declines to conclude the BOP acquiesced in the fight between Vasquez and Vickers or in Vasquez lifting Vickers over his shoulder and throwing Vickers forcefully head-first against the concrete floor causing Vickers serious bodily injury.

Accordingly, the Court concludes on this record that the BOP is a victim under the MVRA and orders Vasquez to pay restitution to the BOP in the amount of $42,453.64.

The Court **DIRECTS** the parties to file **no later than August 7, 2012**, a joint statement setting forth their recommendations as to the following, together with a concise

---

[2] The Court notes Vickers previously informed the Court in testimony that he is pursuing a civil damages claim against the BOP for its alleged failures that Vickers contends contributed to his injuries. As yet, however, there has not been any factual determination that there was any tort culpability on the part of the BOP that lead to Vickers' injury. The Court declines to extend this criminal restitution issue to a proceeding to determine that tort liability.

10 - OPINION AND ORDER

statement of the reasons therefore:

1. Should interest accrue on this obligation?

2. Should Defendant be required to pay a fractional portion of the funds he has on deposit with the BOP, including any earnings, while he is incarcerated?

3. How much is the minimum monthly obligation Defendant should be ordered to pay as a condition of supervised release once he is released from custody?

## CONCLUSION

For these reasons, the Court **ORDERS** Defendant Vasquez to pay restitution to the BOP in the amount of **$42,453.64** on terms to be determined by the Court after the parties' submissions on August 7, 2012.

IT IS SO ORDERED.

DATED this 20th day of July, 2012.

/S/ Anna J. Brown

　　　　　　　　　　　　　　　　　　　　　　
ANNA J. BROWN
United States District Judge

11 - OPINION AND ORDER