IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    3:11-CR-00026-BR
                                             (3:14-CV-01479-BR)
              Plaintiff,

                                             OPINION AND ORDER
v.

TOMMY LEE VASQUEZ,

              Defendant.


BILLY J. WILLIAMS
Acting United States Attorney
RYAN W. BOUNDS
JOHNATHAN S. HAUB
Assistant United States Attorneys
1000 S.W. Third Avenue
Suite 600
Portland, OR  97204
(503) 727-1000

              Attorneys for Plaintiff

ROBERT W. RAINWATER
Rainwater Law Group
1327 S.E. Tacoma
Suite 239
Portland, OR 97202
(971) 271-7566

              Attorney for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Tommy Lee Vasquez's Amended Petition/Motion (#162) Under 28 U.S.C. § 2255.

For the reasons that follow, the Court **DENIES** Defendant's Motion and **DENIES** a certificate of appealability.


## BACKGROUND

On January 20, 2011, Defendant Tommy Lee Vasquez was charged in an Indictment with one count of Assault Resulting in Serious Bodily Injury in violation of 18 U.S.C. § 113(a)(6). In a Superseding Indictment dated December 6, 2011, a grand jury charged Defendant with one count of Assault with a Dangerous Weapon in violation of 18 U.S.C. § 113(a)(3) and one count of Assault Resulting in Serious Bodily Injury in violation of 18 U.S.C. § 113(a)(6).

On December 22, 2011, Defendant filed a Motion to Dismiss the Superseding Indictment on the ground of prosecutorial misconduct or, in the alternative, to dismiss Count One of the Superseding Indictment on the ground that it failed as a matter of law.

On February 8, 2012, the Court issued an Order in which it denied Defendant's Motion to Dismiss on the ground of prosecutorial misconduct. In a separate Opinion and Order issued

that same day the Court granted Defendant's Motion to Dismiss Count One of the Superseding Indictment.

From February 28, 2012, through March 2, 2012, Defendant's case proceeded to trial to a jury on Count Two of the Superseding Indictment:  Assault Resulting in Serious Bodily Injury.

On March 5, 2012, the jury rendered a Verdict finding Defendant guilty.

On May 30, 2012, the Court sentenced Defendant to a term of 60 months imprisonment to be served consecutively with the sentence Defendant was already serving and three years supervised release.  On June 1, 2012, the Court entered a Judgment.

On June 20, 2012, Defendant filed a Notice of Appeal to the Ninth Circuit.

On July 20, 2012, the Court entered an Opinion and Order in which it ordered Defendant to pay restitution in the amount of $42,453.64.

On October 9, 2012, the Court entered an Amended Judgment to reflect the Court's Order of restitution.

On September 17, 2013, the Ninth Circuit affirmed Defendant's conviction and sentence.

On September 16, 2014, Defendant filed a Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255.

On February 9, 2015, Defendant filed an Amended Petition/Motion (#162) Under 28 U.S.C. § 2255.  The Court took

3 - OPINION AND ORDER

Defendant's Amended Motion under advisement on June 15, 2015.


### STANDARDS

28 U.S.C. § 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right
> to be released upon the ground that the sentence
> was imposed in violation of the Constitution or
> laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or
> that the sentence was in excess of the maximum
> authorized by law, or is otherwise subject to
> collateral attack, may move the court which
> imposed the sentence to vacate, set aside or
> correct the sentence.

> * * *

> If the court finds that the judgment was rendered
> without jurisdiction, or that the sentence imposed
> was not authorized by law or otherwise open to
> collateral attack, or that there has been such a
> denial or infringement of the constitutional
> rights of the prisoner as to render the judgment
> vulnerable to collateral attack, the court shall
> vacate and set the judgment aside and shall
> discharge the prisoner or resentence him or grant
> a new trial or correct the sentence as may appear
> appropriate.

Although "the remedy [under § 2255] is . . . comprehensive,
it does not encompass all claimed errors in conviction and
sentencing. . . . Unless the claim alleges a lack of
jurisdiction or constitutional error, the scope of collateral
attack [under § 2255] has remained far more limited." *United
States v. Addonizio*, 442 U.S. 178, 185 (1979).

## DISCUSSION

Defendant moves to vacate or to set aside his sentence on the grounds of prosecutorial misconduct, ineffective assistance of counsel, errors by the trial court, and the "cumulative impact of errors."

## I.    Prosecutorial Misconduct

Defendant asserts his conviction and sentence are void and violate the Fifth and Sixth Amendments because the prosecutor committed misconduct by (1) knowingly presenting perjured testimony from Corrections Officer Jeremy Jensrud at trial and (2) making an improper argument during rebuttal.  Specifically, Defendant contends Officer Jensrud contradicted his trial testimony in an FBI interview conducted in July 2012, four months after Defendant's trial, regarding his location just before Defendant and inmate Theodore Vickers got into an altercation.

### A.    Officer Jensrud's Testimony

The Ninth Circuit has held a prosecutor must "'refrain from knowingly presenting perjured testimony and from knowingly failing to disclose that the testimony used to convict defendant was false.'"  *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002)(quoting *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991)).

At trial Officer Jensrud testified in pertinent part:

Q.    When you were out on the patio, you indicated
      that you looked into the unit and saw
      something.  Is that correct?

A.    Yes, ma'am.

Q.    What did you see?

A.    I saw Inmate Morris's moccasins.

                        *  *  *

Q.    And at that point in time did you become more
      concerned?

A.    I had an uneasy feeling.

Q.    And what did you do in response to that
      uneasy feeling?

A.    Officer Michaelson was talking to Lieutenant
      Van Cleave.  I told him that I may have a
      fight in the unit.

Q.    And the fight would have been between which
      inmates?

A.    In between, [Defendant] and Inmate Vickers.

Q.    And you had thought that because of Inmate
      Morris.  Correct?

A.    Yes, ma'am.

Q.    And that's because Inmate Morris was Vickers'
      cell mate.  Correct?

A.    Yes, ma'am.

Q.    You didn't assume that Inmate Vickers would
      have gone to fight [Defendant] without Inmate
      Morris being there.  Correct?

A.    No, ma'am.

Q.    Inmate Morris was critical to this issue, to
      your concern?

A.   Because it was something out of the ordinary
that he would ever do.

Gov't Mem. in Opp'n, Ex. 1 at 15-17.

Defendant asserts Jensrud "admitted" in his July 2012
FBI interview that when he first saw Morris's moccasins, Jensrud
was "actually inside of Unit 4A before the fight started,
standing between the dirty laundry bin and handicap chairlift."
Def.'s Am. Mot. at 4.  Defendant asserts in his Reply that
Jensrud's statement in the FBI report "completely contradicts"
his trial testimony, and the government should have known
Jensrud's trial testimony was false because the video of the
incident establishes Jensrud's location.  The FBI report states:

> JENSRUD stated that he first saw MORRIS'S
> moccasins while JENSRUD was standing outside in
> front of the entrance to Unit 4A. . . .  JENSRUD
> stated that before he identified MORRIS as the
> inmate standing on the tier, JENSRUD was outside
> on the patio. . . .  JENSRUD stated that when he
> came back in Unit 4A, he stood in between the
> dirty laundry bin and the handicap chairlift.
> JENSRUD stated that he then looked to the right,
> and saw one of MORRIS'S moccasins hanging over the
> tier floor approximately two inches.  JENSRUD
> stated that when he was outside Unit 4A on the
> patio and looked through the glass pane window
> . . . MORRIS was approximately . . . five to eight
> feet away from JENSRUD'S office.  JENSRUD stated
> that after watching the video . . . again [he
> explained that his trial] testimony detail[ed]
> where he saw MORRIS standing before the video
> . . . was captured.

Def.'s Am. Mot., Ex. 2 at 2.  As Plaintiff points out, however,
Jensrud makes clear that his trial testimony about the moment he
first saw Morris's moccasins relates to a period of time before

7 - OPINION AND ORDER

the video captured Jensrud's movements.  The video submitted to
the Court by Defendant reflects an indistinct individual whose
movements are almost totally obscured by the staircase, the
movements of other individuals coming into the unit briefly, and
an individual exiting the unit.

　　　　The Court notes even if Jensrud's statement to the FBI
contradicts his trial testimony, which is questionable, his
statement was given to the FBI four months *after* the trial.  In
any event, there is not any evidence that any such contradiction
would have been known to the prosecutor at the time of trial.
Indeed, the video does not provide any view of the individual
entering and leaving the Unit sufficient to raise concerns as to
the truthfulness of Jensrud's testimony, particularly in light of
his statement at the end of the FBI interview that his trial
testimony detailed where he saw Morris standing before the video
was captured.

　　　　On this record, therefore, the Court concludes
Defendant has not established the prosecution knowingly presented
perjured testimony by Jensrud to the jury.

**B.    Rebuttal Argument**

　　　　Defendant asserts the prosecutor committed
prosecutorial misconduct when he made the following statement
during rebuttal:

> And Ms. Manes has done an excellent job defending
> her client.  She's committed to his defense.  And

8 - OPINION AND ORDER

> her job is not to get you the truth, but to cause
> reasonable doubt; and that's what her argument was
> designed to do, create a reasonable doubt.

Trial Tr. at 882.  Specifically, Defendant contends this
statement "casts the defense counsel as a liar."

The government notes Defendant failed to assign error
to that statement on direct appeal and does not offer good cause
for the omission.  Accordingly, this claim is procedurally
barred.  Even if this claim was not procedurally barred, the
government asserts Defendant fails to establish that the
statement "by itself so infected the entire trial that the
resulting conviction violates due process, not merely [that it
was] undesirable, erroneous, or even universally condemned."
*United States v. Frady*, 456 U.S. 152, 169 (1982)(quotations
omitted).  It is "well[] settled . . . that to obtain collateral
relief a prisoner must clear a significantly higher hurdle than
would exist on direct appeal."  *Id*. at 166.  The Court agrees.

The prosecutor made the statement at issue within the
context of a four-day trial generating a 900-page trial
transcript.  The argument in which the one statement occurred
spanned eight pages.  In addition, the prosecutor's statement
immediately followed his observation that during closing argument
Defendant had "suggested that the Government ha[d] failed in its
burden because of certain unanswered questions and certain
suggestions that [the prosecution] should disprove the

possibility of certain instances and events." Def.'s Mem. in
Opp'n, Ex. 5 at 32. When that statement is viewed as the
background for the challenged argument, it is clear that the
prosecutor sought to address Defendant's assertion that the
government failed to prove beyond a reasonable doubt that "it is
not possible that [Vickers's] injury occurred after [Defendant]
left the room" rather than to impugn defense counsel's honesty.
The prosecutor also sought to address defense counsel's statement
that

> [i]f the Government has not proven to you and
> proven beyond a reasonable doubt that this injury
> was not caused after Tommy Vasquez left the room,
> then you must acquit Tommy Vasquez. That's our
> question. That's what we're trying to answer.

*Id.*, Ex. 5 at 18. In the context of the entire trial and
Defendant's closing argument in particular, the prosecutor's
statement was a permissible "comment[] . . . directed to 'the
strength of the defense on the merits.'" *Ruiz*, 710 F.3d at 1086
(quoting *United States v. Nobari*, 574 F.3d 1065, 1079 (9th Cir.
2009)).

In any event, the prosecutor's comment was well within
the realm of statements that the Ninth Circuit has held do not
constitute prosecutorial misconduct. For example, in *Ruiz* the
Ninth Circuit held "the prosecutor's characterization of the
defense's case as 'smoke and mirrors' was not misconduct." 710
F.3d at 1086. The court found "[t]he prosecutor's comments were

10 - OPINION AND ORDER

directed to the strength of the defense on the merits and did not amount to an *ad hominem* attack on defense counsel." *Id.* (citation omitted). Similarly, in *Williams v. Borg* the Ninth Circuit concluded the prosecutor's comment that defense counsel's argument was "'trash' cannot be characterized as improper." 139 F.3d 737, 745 (9th Cir. 1998). In *Williams* the Ninth Circuit cited with approval *United States v. Davis* in which the Seventh Circuit concluded after viewing the trial as a whole that the defendant was not unduly prejudiced by the prosecutor's remarks that the defendant's case was "hogwash, trash, and garbage." 15 F.3d 1393, 1403 (7th Cir. 1994).

On this record the Court concludes Defendant has not established prosecutorial misconduct.

## II. Ineffective Assistance of Counsel

Defendant also moves to vacate his conviction and sentence on the ground of ineffective assistance of counsel. Defendant raises seven grounds on which he alleges his counsel was deficient.

### A. Standards

The Supreme Court has established a two-part test to determine whether a defendant has received constitutionally deficient assistance of counsel. *Premo v. Moore*, 131 S. Ct. 733, 739 (2011). *See also Strickland v. Washington*, 466 U.S. 668, 678, 687 (1984). Under this test a defendant must not only prove

11 - OPINION AND ORDER

counsel's assistance was deficient, but also that the deficient performance prejudiced the defense. *Premo*, 131 S. Ct. at 739. *See also Sexton v. Cozner,* 679 F.3d 1150, 1159 (9th Cir. 2012); *Ben-Sholom v. Ayers*, 674 F.3d 1095, 1100 (9th Cir. 2012).

"To prove deficiency of performance, the defendant must show counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms." *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992)(citing *Strickland*, 466 U.S. at 687-88)). *See also Sexton*, 679 F.3d at 1159 (citing *Premo*, 131 S. Ct. at 739). The court must inquire "whether counsel's assistance was reasonable considering all the circumstances" at the time of the assistance. *Strickland*, 466 U.S. at 688. *See also Detrich v. Ryan*, 677 F.3d 958, 973 (9th Cir. 2012). There is a strong presumption that counsel's assistance was adequate. *Strickland,* 466 U.S. at 689. *See also Sexton*, 679 F.3d at 1159. To overturn a guilty plea, the defendant must show a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). *See also Smith v. Mahoney*, 611 F.3d 978, 988 (9th Cir. 2010).

To prove prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

12 - OPINION AND ORDER

been different." *Strickland,* 466 U.S. at 694. *See also Sexton*, 679 F.3d at 1159-60. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695. *See also Sexton*, 679 F.3d at 1160.

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland,* 466 U.S. at 697. *See also Heishman v. Ayers*, 621 F.3d 1030, 1036 (9th Cir. 2010). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland,* 466 U.S. at 697. *See also Heishman*, 621 F.3d at 1036.

**B.    Ground One**

In his first ground for relief Defendant asserts defense counsel, Assistant Federal Public Defender (AFPD) Renee Manes, was ineffective when she failed to give an adequate explanation of the plea offer that Defendant received before trial. Specifically, Defendant asserts AFPD Manes did not explain or attempt to negotiate the amount of restitution. Defendant contends if he had been adequately advised of the plea offer, including the correct amount of restitution, he would have accepted it.

The record reflects on April 20, 2011, Assistant United States Attorney (AUSA) Ryan Bounds sent AFPD Manes a written plea

13 - OPINION AND ORDER

offer.  The offer was silent on the issue of restitution.  On

June 16, 2011, AFPD Manes emailed AUSA Bounds and noted although

Defendant was willing to plead to a misdemeanor, AFPD Manes "was

concerned that [she] did not see any information on restitution."

Def.'s Mem. in Opp'n, Ex. 3 at 12.  AFPD Manes inquired whether

the government was going to make a claim for restitution.

On July 6, 2011, AUSA Bounds advised AFPD Manes via

email:

> I have received the attached hospital itemization,
> as well as BOP's report that its out-of-pocket
> expenses were $31,160.41.  That figure is what I
> am required to use by statute and DOJ policy as
> the restitution amount.  (The $42k-odd figure on
> the bill is just for reference.)  I think it's
> safe to say that neither one of us expects that
> your client can or will pay the amount in full,
> but the law requires him to work diligently to
> discharge it at a reasonable rate.

Def.'s Mem. in Opp'n, Ex. 3 at 38.

On July 13, 2011, AFPD Manes advised AUSA Bounds via

email:

> As I understand it, the current restitution amount
> is $42k for the hospital, and $31k for the BOP,
> and as I read the statute it would also allow
> Vickers to come in and demand restitution on his
> own of who knows how much.  This could well be a
> deal breaker, since Mr. Vasquez has several
> children and would prefer to send any earnings to
> them and their mother.  Let me confirm his
> preference in the next week.

Def. Memorandum in Opp., Ex. 3 at 39.  On July 18, 2011,

AFPD Manes sent Defendant a letter in which she advised him in

pertinent part that she was "talking with the AUSA about the

14 - OPINION AND ORDER

restitution issues" and that she would be "out to talk with you about those issues soon." Def.'s Mem. in Opp'n, Ex. 3 at 41.

On September 14, 2011, AFPD Manes advised AUSA Bounds via email:

> Unfortunately our client does not want to spend the next 20 years living in the BOP impoverished, which is what will happen with a $30k+ restitution order. . . . I can't find a way around the MVRA though. So I will tell Judge Brown that we need a trial date certain.

Def.'s Mem. in Opp'n, Ex. 3 at 42. As noted, the Court ultimately ordered Defendant to pay restitution in the amount of $42,453.64.

Defendant testifies in his Second Declaration that AFPD Manes told him at some point that the amount of restitution requested by the government was $42,559.62 plus $31,160.41. Defendant also testifies AFPD Manes never discussed with Defendant any negotiations that she had with the government with respect to restitution. Finally, Defendant testifies in his initial Declaration that if he had known the restitution amount was in fact $42,553.62, he would have accepted the plea agreement.

AFPD Manes testified at deposition in April 2015 that she did not specifically remember the conversations she had with Defendant about the amount of restitution.

The record reflects AFPD Manes may have been confused as to the amount of restitution that the government was seeking

in July 2011 when she emailed AUSA Bounds:  "As I understand it, the current restitution amount is $42k for the hospital, and $31k for the BOP."  By September 14, 2011, however, the record appears to reflect AFPD Manes understood the government was seeking $31,000 in restitution when she advised AUSA Bounds that Defendant did "not want to spend the next 20 years living in the BOP impoverished, which is what will happen with a $30k+ restitution order."  In addition, the record reflects AFPD Manes's billing and travel records reflect she traveled to meet with Defendant on September 14, 2011, to talk about the plea agreement.  This is circumstantial evidence that AFPD Manes communicated to Defendant on September 14, 2011, that the amount of restitution the government intended to seek was $31,000 and that Defendant was aware of that amount when he later rejected the plea offer.

The Court finds Defendant's current assertion that he would have accepted a plea offer with a restitution amount of $45,000 is not credible in light of the evidence in the record contemporaneous with Defendant's decision.  The Court also does not find credible Defendant's current assertion that AFPD Manes failed to advise him at any time that the restitution amount sought by the government was $31,000 rather than $75,000.

Accordingly, on this record the Court finds AFPD Manes did not render ineffective assistance of counsel with respect to

the plea offer.

    **C.  Ground Two**

      In his second ground for relief Defendant asserts AFPD Manes was ineffective when she failed to cross-examine Officer Jensrud about his presence in Unit 4A as subsequently discussed by Jensrud in the FBI report.  Defendant asserts if AFPD Manes had properly cross-examined Jensrud, it would have been apparent that an officer was present in Unit 4A and did not assist Defendant, which would have helped establish that Defendant "knew he would get no help from authorities" and support his self-defense argument.

      As already noted, the video is unclear as to Jensrud's presence in the Unit, and there is nothing in the video that would have alerted AFPD Manes to cross-examine Jensrud more closely than he was with respect to his presence in the Unit.  In any event, because Jensrud stated in his interview with the FBI that his trial testimony related to a time before the video captured Jensrud's actions, it is questionable whether Jensrud's statement to the FBI undermines his trial testimony to the extent that Defendant asserts.

      On this record the Court concludes AFPD Manes did not render ineffective assistance when she failed to cross-examine Jensrud more closely about his presence in Unit 4A.

17 - OPINION AND ORDER

**D.    Ground Three**

In his third ground for relief Defendant asserts AFPD Manes was ineffective when she failed to "call or consult, prior to trial, with an expert in the enhancement of surveillance video" because doing so would have helped the jury to recognize that "Officer Jensrud was present immediately before the fight and left the cell area instead of intervening." Defendant asserts this would have bolstered his self-defense argument as noted above.

Defendant's argument is unpersuasive. The video submitted to the Court shows part of an unidentifiable person almost completely obscured by the stairs and individuals coming and going in the Unit. There is not any basis in the record to conclude that enhancing the video would have made it possible to know the identity of the individual because only his legs and the very top of his head can be seen and his face is totally blocked by the stairs.

On this record the Court concludes AFPD Manes did not render ineffective assistance when she did not call or consult an expert as to the enhancement of surveillance video.

**E.    Ground Four**

In his fourth ground for relief Defendant asserts AFPD Manes was ineffective because she failed to call a criminology expert "to testify to the nature of the imminence in

18 - OPINION AND ORDER

a correctional institution and the significance of Officer
Jensrud's failure to intervene when he first became aware of the
possibility of a fight."  Defendant asserts if AFPD Manes had
called a criminology expert, the expert could have testified as
to the reasonableness of Plaintiff's belief that he was subject
to imminent harm and could have given further weight to
Defendant's claim of self-defense.

Defendant relies on AFPD Manes's Declaration submitted
in support of Defendant's fourth ground for ineffective
assistance of counsel in which AFPD Manes testifies, among other
things, that after the trial she learned through another defense
attorney about an expert "who testified frequently on behalf of
officers in excessive force cases" and who "would have been able
to testify to the reasonableness of the response of [Plaintiff]
to the threat of harm" during the altercation.  Decl. of Renee
Manes at ¶ 2.  AFPD Manes further testifies she "did not have any
tactical reason for failing to call [the expert]."  *Id*. at ¶ 3.

In Ground Four Defendant also moves to strike paragraph
3 and the last sentence of paragraph 4 of AFPD Manes's
Declaration on the ground that they involve testimony about the
jury's deliberations.

### 1.    **Plaintiff's Motion to Strike**

As noted. Plaintiff moves to strike paragraph 3
and the last sentence of paragraph 4 of AFPD Manes's Declaration.

19 - OPINION AND ORDER

Federal Rule of Evidence 606(b) provides in pertinent part:

> [A] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or *evidence of a juror's statement on these matters.*

Emphasis added.  *See also Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008)(The district court did not err when it concluded portions of the declarations of two jurors were "inadmissible as the subjective mental processes of Jurors No. 1 and 7.").  Paragraph 3 and the last sentence of paragraph 4 of AFPD Manes's Declaration contain testimony about the mental processes of an unnamed juror in this matter.

Accordingly, the Court grants Plaintiff's Motion, strikes paragraph 3 and the last sentence of paragraph 4 of AFPD Manes's Declaration, and does not rely on the information contained therein.

### 2.  Failure to Call Criminology Expert

Although AFPD Manes did not call a criminologist, she elicited testimony from Defendant and others on the issue of self-defense; prison culture; and inmates' belief in general, and Defendant's belief in specific, that sometimes it is impossible to avoid an altercation.  For example, Defendant testified:

> Q.   Did you feel that you had a choice at that point?

> A.    Not really.
>
> Q.    And why is that?
>
> A.    Because the way he was disrespecting me out
>        there in front of the whole pod, that in a
>        situation like that, you know, you either got
>        to fight or somebody has got to back down,
>        you know.  And if somebody backs down, then
>        that leaves the door open for any of the
>        other inmates to try to take advantage of you
>        at that point, you know.  They try to think
>        you're weak, or they can tell you you need to
>        roll up, because if you ain't going to fight,
>        you just need to go to the hole.

Trial Tr. at 641.  With respect to the beginning of the fight

Defendant testified:

> A.    And then he started telling me he was going
>        to kick my ass and this and that, and I told
>        him, "No, you're not."  And he threw a kick.
>        I grabbed his leg, and we started fighting.
>
> Q.    Let's back up a bit.  How are you feeling as
>        you're standing in the TV room watching Mr.
>        Vickers and Mr. Morris come down at you?
>
> A.    I'm pretty scared.  I'm kind of -- I know I'm
>        in a situation that, you know, I probably
>        can't get out of now.

Trial Tr. at 645.

AFPD Manes also elicited testimony from Vickers
about prison culture and the perceived inability of an inmate to
walk away from a fight.  For example, Vickers testified:

> Q.    You and . . . Mr. Morris, at one point in
>        time, went to the Hispanic TV room.  Right?
>
> A.    I was asked to come up there.
>
> Q.    And you didn't have to go up there, did you?

21 - OPINION AND ORDER

```
          A.   Well -- and yes, I had to go up there.

          Q.   You believed you had to go up there?

          A.   Yes.  If I didn't go up there, then I would
               be a coward and a punk.

          Q.   So you went up there to demonstrate that you
               were not a coward and a punk?

          A.   Yes, ma'am.
```

Trial Tr. at 350.

At trial AFPD Manes called two other experts on Defendant's behalf regarding the possibility that Vickers's injuries were the result of an accidental fall to the concrete floor rather than the result of Defendant's actions.

On this record the Court concludes AFPD Manes did not render ineffective assistance when she failed to call a criminology expert.

**F.    Ground Five**

In his fifth ground for relief Defendant asserts AFPD Manes was ineffective when she failed to notice the surveillance video showed Vickers was wearing his glasses on his way to the television room contrary to the testimony of Vickers and Morris that Vickers left the glasses in his cell.  Defendant notes the prosecutor pointed out in his closing argument that the video shows Vickers was wearing his glasses when he went to the television room as evidence that Vickers did not intend to get into a fight.  Defendant asserts AFPD Manes's failure to note the

22 - OPINION AND ORDER

fact that Vickers was wearing his glasses reduced the credibility of her arguments.  Defendant also asserts AFPD Manes's failure to observe that Vickers was wearing his glasses in the video resulted in a missed opportunity to impeach the testimony of Vickers and Morris.  The record, however, reflects AFPD Manes thoroughly questioned Morris and Vickers and raised credibility issues with both of the witnesses.

On this record the Court concludes AFPD Manes did not render ineffective assistance when she failed to notice the surveillance video showed Vickers was wearing his glasses on his way to the television room.

**G.  Ground Six**

In his sixth ground for relief Defendant asserts AFPD Manes was ineffective when she failed "to explain adequately to the jury the subjective element of a claim of self-defense." Specifically, Defendant asserts AFPD Manes failed to explain adequately that the law requires the jury to view the reasonableness of Defendant's actions under the specific circumstance of prison.

As the Court noted in its opening sentence of the jury instructions, it is the duty of the Court rather than counsel to advise the jury on the law that applies.  The Court instructed the jury on the elements of self-defense, including the standards for evaluating Defendant's actions.  Defendant did not raise on

23 - OPINION AND ORDER

appeal the issue of this Court's instruction on self-defense.

On this record the Court concludes AFPD Manes did not render ineffective assistance when she failed "to explain adequately to the jury the subjective element of a claim of self-defense."

### H.    Ground Seven

In his seventh ground for relief Defendant asserts AFPD Manes was ineffective when she failed to object to the prosecutor's presentation of Jensrud's testimony and failed to object to the prosecutor's statements that Defendant contends constitute prosecutorial misconduct.  Because the Court has concluded the prosecutor did not engage in prosecutorial misconduct, the Court also concludes AFPD Manes did not render ineffective assistance when she did not object to Jensrud's testimony and the prosecutor's statements.

In summary, the Court concludes Defendant has not established AFPD Manes provided ineffective assistance of counsel.

### III. Trial Court Errors

Defendant also moves to vacate his conviction and sentence on the ground of alleged Court errors during trial. Specifically, Defendant asserts this Court erred when it (1) did not allow Defendant to present a defense of duress, (2) did not allow evidence of Vickers's earlier fight with another inmate,

24 - OPINION AND ORDER

and (3) admitted the testimony of Sergeant Fox.

Defendant raised each of these alleged errors in his direct appeal in the Ninth Circuit, and the Ninth Circuit affirmed this Court's decisions on each of those issues. Generally a defendant may not relitigate in a § 2255 proceeding issues that have been resolved on appeal. *See, e.g., United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985)(A defendant "is barred from using a § 2255 motion to relitigate issues decided on direct appeal."); *United States v. Manzo*, 675 F.3d 1204, 1211 n.3 (9th Cir. 2012)(same).

> A habeas petitioner may overcome this rule [when] "1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) manifest injustice would otherwise result."

*Johnson v. United States*, No. C14-0164RSM, 2014 WL 4546950, at *5 (W.D. Wash. Sept. 12, 2014)(quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)). Although Defendant does not identify any exception to the rule that applies in this case, he contends the Court would have decided differently on these issues if the surveillance video had been "properly analyzed." The Court disagrees. The fact that Vickers is wearing his glasses in the video and that Jensrud went in and out of the Unit is insufficient to establish that the Court's decisions on duress, prior fight evidence, and the testimony of Sergeant Fox were clearly erroneous or that the evidence is substantially different

25 - OPINION AND ORDER

from that presented at trial.

Accordingly, the Court concludes Defendant may not relitigate in his § 2255 Petition alleged errors by this Court that have been resolved by the Ninth Circuit on appeal.

**IV.  Cumulative Impact**

Finally, Defendant asserts the cumulative impact of the alleged prosecutorial misconduct, ineffective assistance of counsel, and trial-court errors is sufficient to warrant setting aside his conviction and sentence.

The Court, however, has concluded there was not any prosecutorial misconduct or ineffective assistance of counsel and that Defendant may not relitigate claims already decided by the Ninth Circuit on direct appeal.  Accordingly, the Court denies Defendant's Amended Motion Under § 2255.

**V.  Certificate of Appealability**

Because the legal issues raised in Defendant's Amended Motion are clearly established, the Court declines to grant Defendant a certificate of appealability.


<u>CONCLUSION</u>

For these reasons, the Court **DENIES** Defendant's Amended Petition/Motion (#162) Under 28 U.S.C. § 2255 and **DECLINES** to

issue a certificate of appealability.

IT IS SO ORDERED.

DATED this 24th day of July, 2015.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

27 - OPINION AND ORDER